Case No. 16-2383, People v. William Coty. Would you please step up and identify yourselves? Morning. My name is Dan Maron. I'm with the Office of the State of Health Defender and I represent Mr. Coty. I'm Assistant State's Attorney Mary Boland on behalf of the People. You basically know the rules. We'll probably let you have some extra time today since this is the only case, but don't meander off. I'm going to just read something to you so you kind of have a little idea of where we're coming from. Obviously, you've read Coty, too, so you know what we're thinking there. But based on the Atkins case, we're saying that minors and adults with intellectual disabilities should be treated similarly under the Illinois Proportionate Penalties Analysis. We see no reason why our community hasn't evolved to standards such as this. And this, we view as a de facto sentence of life. And we don't know why the judge that received this case back didn't consider what we had sent it back for before. So that leaves us wondering what we're going to do now. I agree with some of that. That helps inform me for sure. I just thought you ought to, you know, because it's we're saying basically we don't see why somebody's disabled. And in this case, what's really strange is if you go back and read the record from day one, like here's a guy that can't read and write. And yet Tooman accepts into the record what he admitted to. And there's all sorts of other discrepancies. But we can't do anything about that. But it's like this appears and is a de facto life sentence. And what can I say? So with that in mind, they don't necessarily completely agree with me. But I just thought I'd tell you. So there's hope. All right. There's hope for you. A little anyway. Yeah. Thank you. Thank you. Thank you for calling the case for argument. Again, my name is Dan Mallon. I'm with the State Appellate Defender's Office. I would just to respond. What you can do now is pursuant to Rule 615B-4. Can you support yourself? I'm sorry. Yeah, I can say that. That's for the court. For the court. Okay. We would just ask pursuant to Supreme Court Rule 615B-4, because of the posture of this case, this court can just find that Judge Ford, upon remand, abused his discretion when he imposed a 50-year sentence. We would ask this court to simply just reduce his sentence to 18 hours. In what way did the trial court abuse its discretion as it relates to the mental health issues here? I think he did not, one, meaningfully consider his intellectual disability. He certainly did. I mean, he said he read everything that was given to him. He said he read the transcript of the original trial. He read Judge Tooman's comments about his reluctance to give him the mandatory sentence. He said that he read the reports of the medical experts. He said that he was taking into consideration his low IQ. And, you know, so I don't – it's like the claim here is that he didn't articulate all of the bases for defending the 50-year sentence, but he did mention that he considered all of that. Yes. He said he reviewed the record. He reviewed the trial record. He didn't preside over the trial proceedings. He didn't preside over – Yeah. But neither did we. I would argue that this Court is in just as good a position as Judge Ford to impose a sentence and to fashion a sentence and that this Court should give deference to Judge Tooman, who did preside over all the trial proceedings and who did preside over the sentencing and stated a life sentence is not appropriate in this case. And as Your Honor said, this is a de facto life sentence. This is a sentence that's going to guarantee that he – There's no question. Yes. So, yes, Judge Ford said he considered the transcript, the cold record, the record, you know, but one, when he was actually – But having said that he considered it, I mean, how much more articulate does he have to be in order to satisfy your view of things? Not necessarily. Well, I think it would be – it was appropriate for him to give a little more statement on the record as to the reason he's fashioning a sentence. Considering the unique posture of this case, this case was set down specifically for him to consider Cody's intellectual disability. You know, this Court's aware he's IQ 55 to 65. He's cognitively equivalent to about a fourth grader. So in reality, though, neither the State nor the public defender or appellate defender did anything to have him re-evaluated, nor did they consider anything about his mental health disabilities, which he stated that nobody in the prison reviewed him or analyzed him at all. There was no new evidence presented. There was no objection to his fitness to be sentenced or re-sentenced. I don't know if fitness was necessarily an issue here. I believe the public defender below just essentially read from this Court's order during argument, just telling Judge Ford to consider his intellectual disability and to also consider the specific facts and circumstances of this case. Half the reason was that this case was remanded in the first place, not just his intellectual disability, but it was the specific circumstances surrounding this offense. That's based on this Court's prior order. That's the reason it was remanded to re-sentence. So Judge Ford, considering he doesn't have to articulate ordinarily, generally speaking, a sentencing judge doesn't have to articulate every single factor, mitigation and aggravation. But here, considering the nature of this case, where it was remanded specifically for him to consider the intellectual disability, I think it shows that Judge Ford, the fact that he did not even mention it, did not mention the Rule 23 order, did not mention the mandate, shows he did not give it adequate consideration. And again, when he was actually stating the sentence, all he referred to was the seriousness of this offense, that it was not his first. What did defendants' counsel say at the hearing about all that stuff? I mean, you know, isn't there any responsibility of the lawyer to say something? Absolutely. Go ahead. Go ahead. Absolutely. But I would point out that what the State did is just refer to some off-the-record conversations that the State's attorney had had with the victim's mother. And that was referred to. That was the only – I don't even want to call that a piece of evidence – but that was the only additional factor, additional point of consideration. And Judge Ford actually referred to that when he was sentencing him. There was no new aggravation presented. There was nothing – you know, there was no testimony presented. They basically just relied on the same record. But as we just discussed a moment ago, there was nothing presented at all to give the judge any background as to the defendant's experience while he was incarcerated, while all this other stuff was going on. Not a syllable. No. This court – the public defender relied almost exclusively on this court's prior Article 23 order when it sent back the agreement for resentencing. So what do you consider is a reasonable solution to this? I would ask this court to reduce the sentence to – he served – At our level? Yes. What would you consider to be a reasonable sentence, and why do you say that? Well, I would say he served about 14 years, 7 months in prison. I would say somewhere close to 14 years and 7 months. I would say that adequately reflects his diminished culpability and adequately reflects this offense, the facts and circumstances of this offense. I think it reflects his criminal history. The minimum he could have faced for this offense upon remand was 6 years. I would argue that a sentence closer to the minimum would have been appropriate here. How old is he now? He is 54. So he's close to one of our judges' theory on what a de facto life sentence is. 65, 66, right? Yeah. So, I mean, yes, I would say this court has the authority to reduce the sentence now. I would say he served, again, almost 15 years. Reducing this sentence is appropriate here and appropriate for this court to do. Okay. Thank you. I have a lot of notes. I'm not sure how many I will need. Once again, it's Barry Bowen on behalf of the people. I want to back up just a little bit because I think it's important to note that Judge Ford was asked to resentence. And what did this court say? All we hold is that under the very unique circumstances of this case, a defendant who is mentally retarded, a form of intellectual disability, as it's termed now in Illinois law, that's a paraphrase, should not have been sentenced to mandatory natural life. That is the direction that Judge Ford was given by this court. This court decided he didn't. So what happens is it comes back for resentencing. There is a new PSI. A new PSI lacking any substance because, as we just said and as counsel said, they did nothing. They didn't do anything in reality other than trip over past records. They didn't send him out for an evaluation. He never was evaluated for mental health ability. He was in the general public where he should never have been in the first place. General population. But here's the thing. I think that we cannot ignore that this defendant had four serious felonies in his background. This is his second child that he sexually penetrated, not his first. This is not isolated. Yes, over a period of what, 20-something years? Well, the first one was a separate. It was 1989, and this one was 2004. And in between, he had an attempt, armed robbery, and a felony ag battery. So he gets sentenced. Some are irrelevant to this case. Well, they're not irrelevant to this case. Well, they are for our purposes because we're not interested. This is part of the state's attorney's problem. They don't address the reality of the situation. And here the reality is this guy was abused by both the state and the public defender because he wasn't mentally capable in all probability of ever being where he was put. But that's irrelevant. The point is, nobody before Ford did their job, not Judge Ford, but nobody, the state or the public defender, did their job in getting him evaluated for his disability. And I'm shocked that Tooman originally didn't do more because Tooman is a stickler. Unfortunately, Ford is an aggressive conservative. All right. Well, I'll pick a bone with you in the sense that the state's attorney's office doesn't do our job. Our job is to protect the public as well as the defendant. You know what? If you look back at the trial, though, there was a fitness hearing, and then at the most recent press there were experts. No disability evaluation. But they talked about the gristle scales, what he understood, what his mental functioning was, what his IQ was. So that information was before the court. And I think your frustration, and I hear your frustration. But Tooman had no choice. He had to follow the law. Exactly. Because that's the point, isn't it? And that point is that the state should have reduced the charge based on the evidence. Well, I can't speak for what the state should have. I'm sorry. I was thinking the other side of the case. That's okay. You know, I love pushback, and I'm fine with it. But here's the thing. I don't usually do this. That's okay. It's a case that engenders strong emotions on all sides. It is a difficult case to look at. It is a difficult case to argue against. Because he didn't rape anybody. He didn't murder anybody. He didn't murder anybody. But here's the thing. When the court says, we're going to look at Atkins, and we're going to apply Atkins. Atkins is the equivalent of Roper. Atkins says no death penalty categorically. But then the law has not developed the way it did for juveniles. Miller is not here. Graham is not here. We don't have those types of guidelines. So when you send a case back to a trial court and you simply say, apply the sentencing code, mandatory natural life is off the table. That's consistent with Atkins. But now you're saying to Judge Ford, apply the sentencing code. And so the parties look, and they treat it like any other sentence. A new PSI is ordered. There are four serious felonies in this PSI. The court asks the defense argument. I'll stand on the motion. The motion is generic for reconsideration of sentencing. So the court looks at this and says extended term, he's eligible. That's what was planned here. Extended term is up to 60 years. I'm not going to give him 60 years. I'm going to find mitigation, and I'm going to cut it back to 50. Fifty, in this case, he's a 40-year-old when he commits the offense. Now it's going to be 80. That is effectively, in the other cases where we've looked at for juveniles, that's effectively a de facto life. But does the analysis stop there? When you're looking at adults, it doesn't stop there. A de facto life does not make it an illegal sentence. It may make it less, you know, considered, less careful for the defendant. But it has been upheld in other cases, guilty but mentally ill cases. In other types of adult cases, it gets upheld. So it's not unreasonable for Judge Ford to look at this like any other case and say the mental disabilities were looked at at trial, but he was ultimately convicted of this offense, and he's got a series of offenses that I am also having to look at the protection of the public. Because, you see, it's a double-edged sword. One more step, though. Why didn't he say, why don't we send them to another facility for mentally disabled persons? Why didn't they do that originally? You know, I can't speak to why Judge Ford fashioned the sentence that he did. I think that the sentence looks like every other sentence. The problem is that you have a defendant who has some special considerations. Well, the other thing, did the defendant, through his lawyers, ever suggest to Judge Ford that this man was not fit to be in the general population? Did they ever suggest to Judge Ford that he was not fit to be sentenced or resentenced? No. None of that was raised. No. And that's why I say Judge Ford gave the parties an opportunity to argue. The state argued the aggravation. The victim impact is relevant to a court, by the way. And so the state argued its aggravation. The defense stood on its motion. The court had new PSI, looked at this information, said it had read the transcripts, said it had read the materials that were placed before it, including the two doctors that the defense did ask for the doctor's reports to be considered, and the court said, I've read those. So the court did what it was supposed to do. The guidance is not there from either the U.S. Supreme Court or Illinois Supreme Court. The problem I have with this case, you know, there are people, as Judge Smith alluded to, there are people who kill people and get less time than this. Yeah. Is there anything in the record to explain his rationale why he would have sent someone who was basically the equivalent of a child to 50 years in jail? There isn't. He basically said, I've considered everything. That is usually what this guy does. He dealt with this case just like any other case, except you're dealing with a guy with a 50 IQ. But here's the thing. He dealt with this case like every other case because that is what the law provides at this point. The law doesn't give any guidance to the trial courts or, for this matter, this court, to say we're going to fashion some factors. The Miller factors are not applicable. Life expectancy tables, the defendant would like you to reduce his sentence. Now he's asking at the bench to reduce it to 15 years. In his brief, he says reduce it to 30 years so that he can only serve 25 years, so he can be 65 when he gets out. But I submit to this court that he relies on two things. He says, well, you can use life expectancy tables. But if we're talking about individualized sentencing, life expectancy tables are not individualized. They take populations and they create one of those bell curves. Half the people die before, half the people die after. So if 65 is what he's claiming to be the average life expectancy, then he's actually advocating for a de facto life sentence for himself because that's the age he would be if he could get out at that age. So that doesn't make any sense. Life expectancy tables are not individualized, and that's why, as I've read through the cases, I wonder why courts would adopt that. You know, if you adopt that kind of concept, you're saying, if you read the life expectancy tables, you're saying that apparently Hispanic females live the longest. So apparently longer life sentences for them would be okay, but other populations, other races, other ethnicities live shorter. This raises the argument that I say is the whole problem with the whole system. Number one, you sentence somebody at day one, and then maybe they get re-evaluated later. Here, he was re-evaluated, but nobody really re-evaluated him. And the point is, with the whole, whether it be a murderer or anybody, they aren't going to redeem themselves in jail if they're under the Holman factors and are below it. They're gone. But there are people in between who get a de facto sentence that should have some opportunity to be evaluated, and when they say no parole, no this, that doesn't solve it. Because you have no motivation. But here we have a guy that's one step further. He has no motivation because he don't know what motivation is. So this is a guy that should be in another institution where they can evaluate him. So if we're doing something, I would say I would want to reduce his sentence and send him to a mental health institution. Well, one thing I can point out is the frustration of courts after the Roper, Miller, and Graham line of cases led states to reconsider how we treat juveniles. And you know the legislature passed that special sentencing provision for juveniles, and now juveniles do get special consideration. But that came from courts figuring out what factors ought to be applied, not just handing out essentially a sentence that says at X years you're out. Although some states now, Illinois is not yet one of them, but some states are saying after X amount of years, 20 years, 25 years, whatever it is, 12 years, 14.5, after some period of time there's a geriatric sentence review. They call it a number of different things. But it's very interesting because I think that kind of meets these types of cases. But we just are not there yet in the law. So I don't think it's fair to say Judge Ford didn't do his job or the parties didn't do their job. I'm not saying Judge Ford didn't. I'm saying the public defenders didn't. And it can be frustrating, but I think that they look, there isn't much case law out there for this type of population. Juveniles, yes, but a number of courts, if you look at the Miller line of cases and you look at state cases after Miller, that bright line is 18. And those factors in Miller all deal with adolescent traits, the transient nature of teenagers and their brain development. And there's all kinds of factors that aren't, that can't be moved over into this category. This individual's brain is not in the development stage. It's not going to get better. He's not going to transition out of his conduct. And he's proven that he is a danger to society. So Judge Ford gave him a longer sentence, but it wasn't the longest, and he did have discretion. And that's exactly what the Illinois Constitution, at least in this court's view, and Cody said, we're going to apply that principle to this individual with an intellectual disability, and we're going to say you can't do mandatory natural life on someone like this. You have to go back and exercise discretion. He did, Judge Ford, exercise discretion. He got 10 less than the maximum. Now, that's frustrating still to this court. It may be frustrating to anyone who's kind of looking at this, except if you realize that he's had some serious offenses in his background. He has not shown. He was, what, a 6-year-old? It was a 6-year-old this time. It was a 9-year-old last time. And then he had the two fountains in the middle. It's a continuing pattern of criminal behavior. Every time he gets out within a short period of time, he is getting back in for some serious offense. These are not minor offenses. So I think that Judge Ford was looking at that and looking at the notion of the seriousness of the offense and the criminal history of this individual outweighs the mitigation, although mitigation is a statutory factor and was considered. It had to have been considered here because the sentence is not the max, and yet this is a four-time felony offender, two-time sex offender. He might be in a better position if all of what you just said was in the sentencing hearing. Yes, if I was doing the sentencing hearing, right. We would have all had not to be here. You should have been on the case. I sometimes join the cases these days, but I try to stay up in appeals. So the thing is, I think that Judge Ford did his job. I think it is still a case where this court may want to look carefully for its options. It certainly has the option under Rule 615. The people do believe the parties did their job. Judge Ford did his job. I don't think Miller provides any basis for this court to make its decision. And if this court is going to make its decision in the Illinois Constitution, in the goal of restoration part of the proportionate penalties clause, if this court is going to do that, then it should fashion a sentence not on life expectancy tables and not on some number picked out of thin air. I think that if this court really is concerned about this individual getting the proper care down below, then it should send it back for a hearing and give some guidance to Judge Ford. By the way, the defendant is asking that Judge Ford be removed from the case. There's no bias. There's no prejudice. Judge Ford did what every trial judge did, looks at the record, looks at the information, makes a decision, exercises discretion. There's no notion that Judge Ford did anything wrong. So the defendant's argument that somehow Judge Ford can't be trusted if there was a remand seems unreasonable. So whether it's Judge Ford or whatever this court decides... Which do you think is more logical? Let us make that decision in the sentence or do we demand it to him? How do you weigh the factors? For instance, your frustration is, hey, there's nobody been looking at his current fitness. There's nobody that looked at these various factors that put him over 90. So we're letting the court do that. Is this court really... We're letting the same thing that the trial court was doing. Yeah. Are you not at the place where you're looking at the record and listening to my argument or defense counsel's argument and trying to decide? I mean, this individual has a right of elocution. He didn't exercise it. Maybe it would be important to hear from him if he chose the next time. I suggest this court has the power to make its decision. It can reduce the sentence on this one-time case if it chooses. But how does that benefit anyone? That's just a number. And where are you basing that number from? Are we just going to let him walk out the door? Are we going to find a third child in the next year? Are we going to see that he gets services? How does this court do that? Is that not better done through his advocacy at the trial level when his own defense attorney can get some guidance from this court and say, you know, these are the things we want you to look at? So remanding him for a mental health evaluation and consider transferring him to some sort of a facility might be more logical. Well, of course, my argument is that we affirm the sentence on appeal. I hear you. I certainly respect the court's concern. And as I say, it was a difficult case all the way around. All right. I thank you very much. That was very, very well done in giving you, thank you. Extremely articulate. Thank you. Very briefly, I completely understand the court's frustration with the lack of the record below. I would still maintain that the most appropriate thing for this court to do now is just to reduce his sentence and then perhaps remand for a hearing to determine what sort of, what occurs after that. He'll have to register for SOAR, of course. He'll have to register as a sex offender for the rest of his life. I think realistically, there's a very realistic chance that if this court were just to remand for a new sentencing hearing, it's going to take another three years before it finally ends up in the trial court. I mean, this court remanded once. The state did not file a PLA. It went back down. Nothing was done. Two years passed before the time of the mandate and before a new sentencing hearing occurred, and nothing was done. You'd like to think that something would change if it were to remand again, but we would submit that this court has the authority and is in just as good a position as to determine an appropriate sentence. And I think this record allows this court to determine an appropriate sentence. And what we would submit that would be is to reduce it to somewhere near 15 years. Just to clarify one point, in our first argument. That's not your prayer for relief in your brief, though. In the brief, you just ask that it be sent back for resentencing in front of a different judge. Second issue, the abuse of discretion. We do ask this court to just reduce the sentence. Then we ask for an alternative to remand for sentencing before a new judge. And one more thing, if I may. What we argued in the first issue was that imposing a discretionary de facto life sentence on Cody in light of his intellectual disability and in light of these facts and circumstances is unconstitutional as applied to him under either the Eighth Amendment or the Illinois Proportionate Penalties Clause. So if it were to go back down for resentencing, we would ask this court to do what it did in People v. Gibson, a juvenile case, where they sent it back down and remanded for resentencing for sentencing without consideration of the firearm enhancements. So what we asked for in the first issue, we're not asking for a 30-year sentence in this case. We're still trying to figure out what happened in Gibson. Do you know what happened? Yes, I do. Okay. I typed it. I know. But he, yeah, he's out. But we would ask this court to send it back down for resentencing if there is a resentencing without consideration to the extended term statute. So that means the range he faces on remand is 6 to 30. So the max he gets is 30. We're not asking for a 30-year sentence, as the State alluded to in its argument. All right. Thank you. The briefs and the arguments were very well done, and this was a case obviously we were interested in. So it was very articulate on both your sides, so I appreciate your input. Thank you. Yeah, both did a great job.